THOMAS B. RAYL ET AL. v. THE ESTATE OF GEORGE H. HAMMOND, DECEASED.

[See 75 Mich. 1.]

*Settlement—Res judicata—Laches*

Where parties have agreed to a settlement of an existing lawsuit, and put it in writing, and signed it, such arrangement must stand until set aside for such fraud as should vitiate it, upon a rescission attempted as soon as practicable after the fraud is known, and with no lack of diligence in discovering it; citing *Lewless v. Railway Co.*, 65 Mich. 292.

Error to Wayne. (Brevoort, J.) Argued March 8, 1894. Decided April 17, 1894.

Appeal from the disallowance of a claim against the defendant estate. Claimants bring error. Affirmed. The facts are stated in the opinion.

*Corliss, Andrus & Leete* (*Alfred Russell,* of counsel), for appellants.

*George H. Lothrop* and *Don M. Dickinson,* for defendant.

GRANT, J.   The facts upon which the court below directed a verdict for the defendant are undisputed, so that the question now before us is one of law.   These facts, and the history of the transactions previous to the filing of this claim in the probate court against the estate of George H. Hammond, are summarized in the brief of one of the learned counsel for the defendant, and are substantially as follows:

1. June 16, 1868, William Davis was granted a United States patent on an improved refrigerator car, for the preservation of meats and perishable articles while in transportation. Samuel H. and David W. Davis, his sons, were interested with him; and, after his death, Thomas B. Rayl became also interested. These are the claimants here,—Samuel H. Davis, David W. Davis, and Thomas B. Rayl.

2. July 1, 1869, these claimants made a contract with George H. Hammond and Caleb Ives. The latter, by such contract, were granted an undivided five-sixths interest in said patent, for certain purposes. Hammond and Ives agreed to furnish all the necessary capital, and to engage in the business of manufacturing, for the use and benefit of the parties thereto, and running upon railroads in the United States, refrigerator cars, to be made according to the description of said invention and improvement contained in the schedule attached to said letters patent, in purchasing and transporting in such cars, and in selling, in fit markets, fresh meats, and other articles that could be profitably conveyed therein, and should keep accurate books of account of all receipts and expenses of the business, which books were to be open at all times to the inspection of all parties.   Settlements were to be made every six months, upon which settlements profits were to be divided, and one-sixth paid to claimants, and five-sixths to belong to Hammond and Ives. The loss, if any, every six months, was to be borne wholly by Hammond and Ives.   Neither party was to assign or transfer any interest in the contract, except by consent of the others.

3. March 8, 1872, a supplemental contract was made, by which Hammond and Ives were authorized to make agreements with railroad companies to run refrigerator cars at a rate not less than 10 cents per 100 pounds for the freight conveyed in such cars, to be paid by the parties using the cars, of which receipts the said Hammond and Ives would keep a true account, the same to be divided as under the terms of the original contract.

4. Under these contracts, Hammond and Ives commenced busi-

ness at Hammond, Ind., associating themselves with Plummer and Towle.    They built a large packing establishment there, where they purchased cattle and other animals, killed them, and transported the meat east in the refrigerator cars.

5. March 5, 1877, claimants sold their one-sixth interest, for $30,000, to Hammond and Ives, and canceled the first contract, and gave receipts in full for all claims against the business.

6. While the business was being conducted, and before the sale, the claimants were paid $38,436.40 as their share of the profits.

7. In a proceeding by one Buttrick, as assignee of Caleb Ives, bankrupt, against Hammond and Towle, in the United States circuit court for the eastern district of Michigan, one Richard Tregaskis, an expert accountant, was employed to examine the books of the business of Hammond & Ives.    He made this examination in November and December, 1878, and made known fully such examination to Buttrick, and gave him a memorandum of his discoveries.    Theodore Romeyn was the attorney for Buttrick. Tregaskis was examined by Romeyn in his office in 1878 as to the information that he obtained from the books, and handed his *memoranda* to Buttrick in Romeyn's office, and made a full statement to them.    All the information he had on this trial, he had then.

8. Romeyn sent for David W. Davis, and told him that he had parties going through Hammond's books, and that he had found large discrepancies, and thought there was a chance for Davis to recover some money there.

9. After this talk between Romeyn and David W. Davis, the claimants made a contract with Romeyn, in which it was set forth that claimants considered that, in the settlement with Hammond & Co., there were "omissions and mistakes, if not positive fraud; that they did not receive their proper share of the profits," and "that at the time of the sale of their interest in the patent there was a large amount due to them for profits from the 1st day of December, 1876, which had never been allowed;" and "that they are entitled to a share or interest in the accumulations of said firm, which has never been credited to them as profits. They further consider that the receipt given by them was without consideration, and founded on misapprehension, and that it was, in law, fraudulent."    By this contract they employed Romeyn as attorney to sue and prosecute their demands in the premises against Hammond and others, and agreed to pay him one-half that he might recover, he to bear costs and expenses.    It contained the following clause:

"The tribunals, modes of prosecution, and terms of adjustment and settlement, if any, are left to his discretion, but no final settlement shall be made without the consent of the parties of the first part.    Said first parties assume no responsibilities in the prem-

ises, excepting that they will give their testimony, and such information as may be in their power."

Another agreement was made by David W. Davis, who had been adjudged bankrupt, in which Davis agreed to get the consent of Corliss, his assignee, to unite in the suit on behalf of Davis. What was received, and going to Davis, was to be disposed of as follows: Fifty dollars to Corliss; then the creditors to be paid the balance; if anything was left after creditors were paid, it was to be divided equally between Romeyn and Davis. The first contract was signed by Samuel H. Davis and Thomas B. Rayl.

10. Samuel H. Davis testified that he knew nothing of these discoveries upon the books until 1886, except the information communicated to him by his brother and Mr. Rayl. Rayl testified that he had no knowledge of the books, nor any knowledge of the claim as appearing on the books; knew nothing about the claim, excepting what Romeyn had told him. He does not testify what Romeyn told him.

11. In December, 1879, a bill in chancery was filed in the superior court of Detroit by Samuel H. Davis, Thomas B. Rayl, and John B. Corliss, assignee, against George H. Hammond, Marcus M. Towle, and Frank Buttrick, assignee of Ives, in which bill they charged Hammond with unlawfully crediting himself with a large salary, and with charges of interest against the business; that they did not receive their share of the profits; that the accounts kept upon the books were fraudulent; that they were entitled to the profits made in a certain hog and offal account, which had been divided among the other members of the firm; that there was an omission in the account of property on hand of sixty or seventy thousand dollars, to wit, an account against a Chicago firm, which was charged up as a loss against the business when the sale was made, in March, 1877, and afterwards credited to Hammond, Ives, and Towle, thus depriving claimants of their share,—one-sixth of such amount; that they believed that large profits were due to them on the 5th day of March, 1877, at the time of the sale and settlement, which had never been accounted for, and that Hammond stated to David W. Davis at that time that no profits had been made; that they were not informed of such mistakes, omissions, and misstatements in accounts furnished to them until a few weeks before filing the bill; that, as they were informed and believed, the property at Hammond—cars, beef, cattle, and hogs —had been purchased out of the property of the firm, and that they were entitled to one-sixth of the same, March 5, 1877; that large amounts of property were at Detroit,—slaughter-houses, and other buildings belonging to said firm,—of which they were entitled to their share; that the receipts given by them, releasing

all claims against Hammond & Co., were procured by fraud and misrepresentation, and without consideration; on information and belief, that drawbacks on regular rates were allowed by the Blue Line Transportation Company to a very large amount, reaching tens of thousands of dollars, which should have been entered upon the books, of which claimants should have had their one-sixth share. This bill prayed for a full accounting as to all these matters, and the whole business carried on by Hammond & Co., and a decree for the amount found to be due to the complainants, and for general relief.

12. September 18, 1880, this suit was settled and discontinued, and an agreement of settlement entered, signed by David W. Davis and his assignee, Corliss, and Thomas B. Rayl; and the said Rayl, as attorney in fact, signed the name of S. H. Davis. This instrument acknowledged "full and complete satisfaction and settlement of all and every of the matters in controversy in said suit in said superior court, and of all rights, claims, or demands against the firms of Hammond & Ives, Hammond, Plummer & Co., and Geo. H. Hammond & Co., and of any and all property and effects of said firms, or either of them, or interests therein, and do hereby release the said second parties and said firms, and each of them, from any and all claims and demands involved in said suit, or arising out of matters therein." David W. Davis, Thomas B. Rayl, and Theodore Romeyn also executed separate papers, guaranteeing to George H. Hammond the fulfillment of said contract.

13. On the same day, and as a part of this settlement, Hammond and the claimants entered into another contract, in which it was agreed as follows in reference to a suit then pending in the United States circuit court for the district of Massachusetts to recover damages for the infringement of the patent of 1868:

" Now, in case it shall be decreed by said circuit court that the said letters patent so granted on the 16th day of June, 1868, and re-issued on the 15th day of September, 1868, as above set forth, are valid, then, upon such final decree being rendered in said circuit court sustaining the validity of said patent upon the third and fourth claims thereunder, and without reference to exceptions or appeal to or from the decree or judgment of said court to the Supreme Court of the United States, or in case said first party shall make a settlement of the matters in said suit without proceeding to final decree, the said party of the first part shall pay to the parties of the second part, their executors, administrators, or assigns, the full sum of ten thousand dollars, for the use and benefit of themselves, or their representatives or assigns."

14. In July, 1886, Tregaskis told S. H. Davis of different accounts he had taken off of the books of Hammond, as the result of his examination in 1878; told him of the Tillinghast account, "and of the various items that ought to belong to us that we did not get."

15. In August, 1886, David W. Davis, for himself, and as assignee of S. H. Davis and Rayl, brought suit in the Wayne circuit court to recover this $10,000. In his declaration he averred that the consideration of the promise to pay this $10,000 was the settlement of all the matters in the superior court suit, and the release of all claims against Hammond & Co., and in further consideration of the promises of the plaintiff and his assignors that they would furnish such testimony as would be necessary to establish the claims and rights of Hammond in the patent. The cause was tried upon that theory, and judgment obtained in the circuit court, and affirmed in this Court. *Davis v. Hammond,* 75 Mich. 1, 4, 5. Davis received the proceeds of said judgment, and has not tendered the same, or any other moneys received on these settlements, to Hammond, or his estate. Rayl received his share, and has kept it.

16. Hammond died in December, 1886. Romeyn died before the commencement of the present suit, but the date of his death does not appear.

17. After Hammond's death the Davises and Rayl filed their claims against the estate of Hammond for $250,000, by reason of fraudulent concealment of the profits of the business of Hammond & Co., arising from the contract relations between the parties, which the claimants were induced to settle by the fraudulent representations and concealments of the profits of the business by said deceased.

That there may be no doubt as to what was involved in the suit against Hammond (75 Mich. 1), we quote the following language from pages 3 and 4 of the opinion:

"The suit is brought against the defendants as administrators of George H. Hammond, now deceased, and was tried in the circuit court for the county of Wayne, upon the theory that the consideration of Hammond's promise, in said agreement was the discontinuance of the suit in the superior court, and the settlement of all claims and demands against Hammond and the firms with which he was connected, and also the further consideration that Rayl and the Davises would render all service in their power to secure and furnish such testimony as might be necessary to establish the rights and claims of Hammond to the letters patent, and the damages for infringement thereof in said 'Boston suit;' that the Davises and Rayl performed their part of the agreement in every respect, and thereby Hammond received the full benefit of the consideration

100 MICH.—10.

upon which his promise was based; that Hammond settled the 'Boston suit,' and then permitted it to be dismissed for want of prosecution, whereby, under his said promise and agreement, he became liable to the plaintiff and his assignors for the full sum of $10,000, which he refused to pay."

The same attorneys who brought this suit, and now appear for the claimants, were also the attorneys for the plaintiff in that suit. Mr. Samuel H. Davis admits that in July, before that suit was brought, Mr. Tregaskis informed him of the different accounts which he had taken from the books of Hammond & Co. in 1878, including the Tillinghast account. It is impossible to reach any other conclusion than that the claimants were then fully aware of all the claims which they now make, and that that suit was based and contested upon the theory that there had been a complete settlement of all their differences. Plaintiff recovered judgment for the full amount, with interest, which was paid; and claimants compromised with Romeyn for one-fourth of the amount recovered, instead of one-half, according to the original contract. They thereby ratified the settlement, and it became *res judicata.*

But there is a further complete answer to the present suit. When it was discovered, in 1878, that claimants had not received all to which they were entitled, and this information was conveyed to them by Mr. Romeyn, they stipulated in their contract with him that he should associate with him, in the litigation, Hon. C. I. Walker, a distinguished attorney of Detroit, which was done. Mr. Tregaskis placed before Mr. Romeyn all the information, and a statement of the accounts, which he had obtained from the books of Hammond & Co. Mr. D. W. Davis then knew of the examination made by Tregaskis, and that the chancery suit which followed was based upon that examination. While he is now quite forgetful, it is

apparent that Mr. Romeyn fully informed him of the claims. He testified:

"The conversation with Mr. Romeyn was about several matters. There are one or two things that I remember. That is what is called the 'Hog and Offal Account' at Hammond, Ind., and one or two other little things that I do not remember of now; but he said it amounted to several hundred thousand dollars due us."

With the information thus obtained' before them, a bill in chancery, for an accounting, was filed, signed by Samuel H. Davis, Thomas B. Rayl, and John B. Corliss, assignee in bankruptcy of David W. Davis, with C. I. Walker as solicitor. The bill is lengthy, and sets forth in detail all the claims which are now filed against the estate of Hammond. The complainants in that suit were not tricked into signing the bill, and are chargeable with ·knowledge of the statements therein made. Under this situation, with notice of the alleged fraud; with a bill filed, charging the specific items of mistake and fraud; with the books of Hammond & Co , at their disposal, for examination; with the opportunity to investigate and ascertain fully the extent of the mistake and fraud; with an expert accountant and a willing witness at their disposal, who had examined the books, from which he had obtained all the information he now. has,—they deliberately, and after several weeks of consideration, enter into the contract of settlement set forth in paragraph 12 of the statement of facts. Mr. Rayl, Mr. D. W. Davis, Mr. Romeyn, and Mr. Hammond were present when the settlement was made. There was no testimony received· or offered tending to show any fraud, misrepresentation, or concealment on the part of Hammond & Co. in making this settlement. It is therefore conclusive, and binding upon all the parties to it.

The language of this Court in *Lewless v. Railway Co.*, 65 Mich. 292, is very applicable to the present case:

"Where parties have agreed to a settlement of an existing lawsuit, and put it in writing, and signed it, such arrangement must stand until set aside for such fraud as should vitiate it, upon a rescission attempted as soon as practicable after the fraud is known, and with no lack of diligence in discovering it."

After the lapse of 10 years, and after death has closed the mouths of Hammond and Romeyn, after a deliberate settlement, and after a solemn ratification of that settlement in another suit, these claimants present the same claim against the Hammond estate, based upon the alleged original fraud. We think there is no authority or reason for reopening the claim.

Judgment affirmed.

The other Justices concurred.